**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

AMAR ALGHAZOULI,
          *Defendant-Appellant.*

No. 06-50422

D.C. No.
CR-05-01148-JAH

OPINION

Appeal from the United States District Court
for the Southern District of California
John A. Houston, District Judge, Presiding

Argued and Submitted
July 11, 2007—Pasadena, California

Filed March 4, 2008

Before: Barry G. Silverman, William A. Fletcher, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge William A. Fletcher

**COUNSEL**

Amar Alghazouli, pro se, Taft, California, Benjamin L. Coleman, San Diego, California, for the appellant.

Melanie K. Pierson, Roger W. Haines, Jr., Office of the U.S. Attorney, San Diego, California, for the appellee.

**OPINION**

W. FLETCHER, Circuit Judge:

Appellant Amar Alghazouli ("Alghazouli") was convicted by a jury on five counts arising out of unlawful importation of R-12 freon, an ozone-depleting substance. Three counts

(Counts 1, 2, and 6) charged Alghazouli with violating 18 U.S.C. § 545. Section 545 prohibits fraudulent or knowing importation of merchandise "contrary to law," as well as the receipt, concealment, or sale of merchandise, or the facilitation of the transportation, concealment, or sale of merchandise, which the defendant knows to have been imported "contrary to law." The fourth count (Count 8) charged Alghazouli with conspiring to violate two money laundering statutes in violation of 18 U.S.C. § 1956(h). That count also charged, as a predicate offense for the money laundering offenses, a violation of 18 U.S.C. § 545. The fifth count (Count 15) charged Alghazouli with violating 42 U.S.C. § 7413(c)(1), based on his having knowingly violated a regulation prohibiting the sale of R-12 freon to an improperly certified person.

Alghazouli makes four arguments on appeal.

First, he argues that the term "law," as used in the phrase "contrary to law" in § 545, does not include a "regulation." Because all of the violations of § 545 charged in Counts 1, 2, 6, and 8 were based on violations of a regulation, Alghazouli argues that he did not violate § 545.

Second, he argues that even if a violation of "law" for purposes of § 545 includes violation of a regulation, the jury was improperly instructed as to the elements of the underlying money laundering offenses that were the objects of the conspiracy charged in Count 8.

Third, he concedes that knowing violation of the regulation at issue in Count 15 is criminal, but he argues that he did not knowingly violate that regulation.

Fourth, he argues that the district court erroneously applied 18 U.S.C. § 3553(a) in imposing the sentence.

For the reasons that follow, we affirm Alghazouli's convictions and sentence.

## I.  Background

Alghazouli and his two brothers, Ahed and Omran, were arrested and tried for activities involving the sale of R-12 freon unlawfully imported from Mexico. Alghazouli was tried separately.

Witnesses at Alghazouli's trial testified that R-12 freon was purchased cheaply in Mexico, brought into the United States without inspection, and then sold to automotive supply dealers. There was evidence that Spanish text on the canisters indicating their Mexican origin was removed before sale. One witness testified that in 1999 a canister of R-12 freon could be purchased in Mexico for between $150 and $185 and then sold in the United States to automotive supply shops for $300 to $450, well below the standard American price of $850 to $1200.

Alghazouli's brother Ahed ran a wholesale automotive supply business. Evidence at trial showed that Ahed was involved in the importation of R-12 freon from Mexico as part of his business. The government presented evidence that Alghazouli was responsible for various activities connected with Ahed's business, that each of the three brothers involved was referred to as "Al," and that all three carried business cards for "United Auto Supply, Wholesale." Four automotive shop owners testified that Alghazouli was the "Al" from whom they had purchased R-12 freon.

An undercover agent for the government testified that he telephoned Alghazouli and requested R-12 freon, and that Alghazouli did not ask if he had the certificate necessary to purchase the freon. He testified that when Alghazouli delivered four canisters of R-12 freon to him, he explained to Alghazouli that he did not have a license, and Alghazouli responded, "Don't worry about it. Just don't mention any licensing." He testified that Alghazouli told him to "play dumb" if anyone asked him about a license.

## II. Standard of Review

We review de novo the meaning of the term "law" in § 545. *See Beeman v. TDI Managed Care Servs.*, 449 F.3d 1035, 1038 (9th Cir. 2006). Alghazouli's Rule 29 motion was premised on an argument about the meaning of the term "law," not on sufficiency of the evidence grounds, requiring this de novo review. *See United States v. Baxley*, 982 F.2d 1265, 1268 (9th Cir. 1992).

We review for plain error the district court's failure to instruct on the elements of money laundering in Count 8 because Alghazouli did not object to the instructions in the district court. *See United States v. Ching Tang Lo*, 447 F.3d 1212, 1228 (9th Cir. 2006).

We review de novo the meaning of the term "knowingly" in 42 U.S.C. § 7413(c)(1). *See United States v. Pasillas-Gaytan*, 192 F.3d 864, 868-69 (9th Cir. 1999).

Finally, we "review 'the district court's interpretation of the Sentencing Guidelines de novo" and "the district court's application of the Sentencing Guidelines to the facts of [a] case for abuse of discretion[.]' " *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006) (citation omitted).

## III. Discussion

We consider in turn the four issues raised by Alghazouli in this appeal.

### A. The Meaning of the Term "Law" in § 545

Alghazouli was convicted on three counts of violating 18 U.S.C. § 545 and one count predicated on that violation. As stated, § 545 provides that anyone who "fraudulently or knowingly imports or brings into the United States, any merchandise *contrary to law*, or receives, conceals, buys, sells, or

in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States *contrary to law*," is subject to fine and imprisonment for up to twenty years. 18 U.S.C. § 545, par. 2 (emphases added). *See, e.g.*, *Roseman v. United States*, 364 F.2d 18, 23-27 (9th Cir. 1966). All four counts were premised on Alghazouli's violation of 40 C.F.R. § 82.4, a regulation promulgated under the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* ("CAA"). Section 82.4 prohibits the importation of "class I" controlled substances. R-12 freon is a class I controlled substance. The question before us is whether violation of 40 C.F.R. § 82.4 is a violation of "law" within the meaning of § 545.

For the reasons that follow, we conclude that Congress intended the term "law" in § 545 to include a regulation when, but only when, a statute (a "law") specifies that a violation of that regulation constitutes a crime. We further conclude that the CAA specifies that violation of § 82.4 is a crime. We therefore affirm Alghazouli's convictions on Counts 1, 2, and 6. We also affirm his conviction on Count 8, subject to our analysis in the following section concerning the jury instructions for that count.

### 1.    Plain Meaning of "Law"

[1] We begin with the text of § 545. *See Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (en banc) (" '[W]e look first to the plain language of the statute . . . to ascertain the intent of Congress.' ") (citations omitted). In common usage, the term "law" does not always, or perhaps even usually, include a "regulation." The 2004 edition of *Black's Law Dictionary* defines "law" narrowly as "a statute." But it also defines "law" more broadly as "[t]he aggregate of legislation, judicial precedents, and accepted legal principles; the body of authoritative grounds of judicial and administrative action; esp., the body of rules, standards, and principles that the courts of a particular juris-

diction apply[.]" *Black's Law Dictionary* 900 (8th ed. 2004). Definitions in earlier editions of *Black's* are similar. *See, e.g.*, *Black's Law Dictionary* 796 (5th ed. 1979). Comparable definitions appear in *Webster's Third New International Dictionary* 1279 (1993). We therefore conclude that the term "law" does not have a plain meaning that necessarily includes a "regulation."

## 2.   History of § 545

**[2]** Because "law" does not have a single clear meaning discernible from the text alone, we look to the history of § 545. "Where, as here, . . . different interpretations can be reconciled with the statutory language, our duty is 'to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.' " *United States v. 594,464 Pounds of Salmon*, 871 F.2d 824, 827 (9th Cir. 1989) (quoting *Commissioner v. Engle*, 464 U.S. 206, 217 (1984) (further quotation marks and citations omitted)); *see also Edwards v. Aguillard*, 482 U.S. 578, 594 (1987) ("The plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history, can control the determination of legislative purpose."). As the Supreme Court has stated, there is no "fixed principle that a regulation can never be a 'law' for purposes of criminal prosecutions. It may or may not be, depending on the structure of the particular statute." *Singer v. United States*, 323 U.S. 338, 345 (1945).

### a.   Meaning of "Law" in the 1866, 1922, and 1930 Tariff Acts

**[3]** Section 545 is the latest version of a provision that was first enacted as Section 4 of the Tariff Act of 1866. Section 4 prohibited the fraudulent or knowing importation of merchandise "contrary to law," as well as the receipt, concealment, or sale of such merchandise or facilitating the

transportation, concealment, or sale knowing the merchandise had been imported "contrary to law."**[1]** *See, e.g.*, *Von Cotzhausen v. Nazro*, 107 U.S. 215, 218-19 (1883) (quoting the 1866 version of the statute).

**[4]** In the decades following the 1866 Tariff Act, the Supreme Court made clear in two cases that a criminal conviction for violating a regulation is permissible only if a statute explicitly provides that violation of that regulation is a crime. The first case, *United States v. Eaton*, 144 U.S. 677 (1892), involved a violation of the Oleomargarine Act of 1885. Section 18 of the Act provided criminal penalties for anyone who " 'shall knowingly or willfully omit, neglect, or refuse to do, or cause to be done, any of the things *required by law* in the carrying on or conducting of his business[.]' " *Eaton*, 144 U.S. at 685 (quoting the Act) (emphasis added). The defendant, a wholesale oleomargarine dealer, was convicted of a crime under Section 18 based on his violation of a bookkeeping regulation promulgated under Section 20 of the Act, which did not specify that the violation of a regulation promulgated thereunder was a crime. The government argued that the word "law" in Section 18 included the bookkeeping regulation. The Court emphatically rejected the government's argument, writing:

---

**[1]**The full text of Section 4 provided as follows:

> That if any person shall fraudulently or knowingly import or bring into the United States, or assist in so doing, any goods, wares, or merchandise, *contrary to law*, or shall receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such goods, wares, or merchandise, after their importation, knowing the same to have been imported *contrary to law*, such goods, wares, and merchandise shall be forfeited, and he or she shall, on conviction thereof before any court of competent jurisdiction, be fined in any sum not exceeding five thousand dollars nor less than fifty dollars, or be imprisoned for any time not exceeding two years, or both, . . .

An Act Further To Prevent Smuggling and for Other Purposes (Tariff Act), 14 Stat. 178, 179 (1866) (emphases added).

> It would be a very dangerous principle to hold that a thing prescribed by the Commissioner of Internal Revenue, as a needful regulation under the oleomargarine act, for carrying it into effect, could be considered as a thing "required by law" . . . in such manner as to become a criminal offence punishable under § 18 of the act, . . .

> It is necessary that a sufficient statutory authority should exist for declaring any act or omission a criminal offence; and we do not think that the statutory authority in the present case is sufficient.

*Id.* at 688; *see also, e.g.*, *Dimmick v. United States*, 121 F. 638, 643 (9th Cir. 1903) (distinguishing its facts from those in *Eaton*, where "there was no statutory authority for the particular regulation for the violation of which the defendant was indicted"); *Van Gesner v. United States*, 153 F. 46, 53 (9th Cir. 1907) (citing *Eaton* for the principle that "[i]t is quite true . . . that no rule or regulation made by the Land Department is a law in the sense that it can make that a crime which is not made a crime by any statute of the United States").

The second case, *United States v. Grimaud*, 220 U.S. 506 (1911), involved a regulation promulgated under the Forest Reserve Act. The Act specified that the Secretary of Agriculture " 'may make such *rules and regulations* . . . as will insure the objects of such reservations; . . . and any violation of the provisions of this act or such *rules and regulations* of the Secretary *shall be punished*' as is provided in § 5388 . . . of the Revised Statutes.' " *Id.* at 515 (quoting the provision) (citations omitted; emphases added). The defendant had violated a regulation promulgated under the Forest Reserve Act. He argued, based on the Court's decision in *Eaton*, that he could not be convicted of a crime based on the violation of a regulation. The Court disagreed, pointing out that, unlike in *Eaton*, "the very thing which was omitted in the oleomargarine act has been distinctly done in the forest reserve act" through the

" 'shall be punished' " language. *Id.* at 519; *see also Loving v. United States*, 517 U.S. 748, 768 (1996) (quoting *Grimaud*, 220 U.S. at 518, to support the proposition that an agency can be delegated the power to define criminal conduct if "Congress makes the violation of regulations a criminal offense and fixes the punishment, and the regulations 'confin[e] themselves within the field covered by the statute.' ") (alteration in *Loving*); *Pappens v. United States*, 252 F. 55, 56 (9th Cir. 1918) (applying the *Grimaud* approach).

In 1915, the Eighth Circuit affirmed a conviction under Section 4 of the Tariff Act of 1866, noting that the relevant statute criminalized violations of the regulation at issue. *See United States v. Estes*, 227 F. 818, 821 (8th Cir. 1915). The defendant had violated regulations promulgated under a statute governing the importation of livestock. The statute specified " '[t]hat any person . . . knowingly violating the provisions of this act or the orders *or regulations made in pursuance thereof . . . shall be punished* by a fine of not less than one hundred dollars nor more than one thousand dollars, or by imprisonment not more than one year, or by both such fine and imprisonment.' " *Estes*, 227 F. at 821 (quoting the statute) (emphases added). The court performed a careful analysis of *Eaton* and *Grimaud*, concluding that the defendant's violations were "contrary to law" within the meaning of Section 4 of the 1866 Act:

> [A]s these regulations were fully authorized by law, and their violation made punishable by law . . . , it must be held, we think, that it was proper to allege in the indictment that the cattle in question had theretofore been imported and brought into the United States from the republic of Mexico contrary to law, as specified in the indictment, so as to bring the charge within the language [of Section 4 of the 1866 Tariff Act].

*Id.* at 821-22.

**[5]** Section 4 of the 1866 Tariff Act was reenacted almost verbatim in the Tariff Act of 1922 and again in the Tariff Act of 1930.[2] *See, e.g.*, *United States v. Mitchell*, 39 F.3d 465, 469 (4th Cir. 1994) (describing the reenactment history); *Gillespie v. United States*, 13 F.2d 736, 738 (2d Cir. 1926) (noting that the 1866 and 1922 provisions are "substantially identical"). Congress thus reenacted the provision that has become § 545 against the background of *Eaton*, *Grimaud*, and *Estes.* That is, Congress reenacted the provision knowing that a criminal prohibition against violating a "law" included a prohibition against violating a regulation when, but only when, a statute specified that a violation of that regulation was a crime.

### b.  Patriot Reauthorization Act

**[6]** In 2006, Congress enacted the USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 192 (2006) ("Patriot Reauthorization Act" or "Act"). Section 310 of the Act amended 18 U.S.C. § 545 by increasing the maximum sentence under § 545 from five to twenty years, but otherwise left § 545 unchanged. Section 311(a) of the Act added an entirely new provision, now codified at 18 U.S.C. § 554. Unlike the newly amended § 545, which still prohibits only violations of "law," the newly

---

[2]The relevant text of the 1922 and 1930 statutes reads as follows:

If any person fraudulently or knowingly imports or brings into the United States, or assists in so doing, any merchandise[,] *contrary to law*, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States *contrary to law*, such merchandise shall be forfeited and the offender shall be fined in any sum not exceeding $5,000 nor less than $50, or be imprisoned for any time not exceeding two years, or both.

Tariff Act of 1922, ch. 356, § 593(b), 42 Stat. 858, 982; Tariff Act of 1930, ch. 497, § 593(b), 46 Stat. 590, 751 (emphasis added; brackets indicate comma present only in the 1922 version).

enacted § 554 prohibits the violation of any "law or regulation," while otherwise tracking the language of § 545.[3]

**[7]** The amendment of § 545 by Section 310 and the simultaneous enactment of § 554 in Section 311 of the Patriot Reauthorization Act indicate that Congress intended "law," as used in § 545, to include a regulation only if a statute specifies that the violation of that regulation is a crime.

Sections 310 and 311 are closely related. Both were enacted as part of the Patriot Reauthorization Act and both are codified in Chapter 27 of Title 18 of the U.S. Code ("Customs"). Both regulate movement across the borders of the United States. Section 545 addresses "Smuggling goods into the United States," and § 554 addresses "Smuggling goods from the United States." Finally, § 554(b) cross-references § 545, specifying that "the term 'United States' has the meaning given that term in section 545."

The close relationship between § 545 and § 554 suggests that the term "law" in each has the same meaning. The statute presents "a classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (internal quotation marks and citations omitted). There is no indication that

---

[3]Section 554(a) provides that:

> Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to *any law or regulation* of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any *law or regulation* of the United States, shall be fined under this title, imprisoned not more than 10 years, or both.

(Emphases added.)

these terms "are found in such dissimilar connections as to warrant the conclusion that they were employed in the different parts of the act with different intent." *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934).

Moreover, § 554 uses the phrase "law or regulation" twice. The conjunction "or" indicates that "law" as used in § 554 does not include all regulations. If it did, the word "regulation" in § 554 would be superfluous. *See*, *e.g.*, *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883) ("It is the duty of the court to give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed."). The logical conclusion, based on the proximity of § 545 and § 554, is that the term "law" in § 545 is not the equivalent of the broader "law or regulation" phrase in § 554. *See also, e.g.*, *Ariz. Elec. Power Co-op. v. United States*, 816 F.2d 1366, 1375 (9th Cir. 1987) ("When Congress includes a specific term in one section of a statute but omits it in another section of the same Act, it should not be implied where it is excluded."); 2A Sutherland, Statutory Construction § 46.6 (6th ed. 2006) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.").

### 3.   Conclusion

**[8]** We therefore conclude that the term "law" in § 545 does not include all regulations. The term includes a regulation only if there is a statute (a "law") that specifies that violation of that regulation is a crime. We note that the only other modern court of appeals to consider the meaning of "law" in § 545 upheld a conviction for violation of a regulation, but on a somewhat different rationale. It held that regulations qualify as "law" only if they have "the force and effect of law." *See Mitchell*, 39 F.3d at 476 (applying a three-part test from *Chrysler Corp. v. Brown*, 441 U.S. 281, 301-03 (1979)).

**[9]** Alghazouli was charged in Counts 1, 2, and 6 with violating 18 U.S.C. § 545. He was charged in Count 8 with conspiring to violate money laundering statutes, whose violation was predicated on a violation of § 545. In all four counts, violation of § 545 was predicated on a violation of 40 C.F.R. § 82.4. Section 82.4 was promulgated under 42 U.S.C. § 7671c. Section 7671c, part of Title VI of the CAA, authorizes the Administrator of the Environmental Protection Agency to issue regulations to phase out the use of ozone-depleting substances. Criminal enforcement of regulations promulgated under § 7671c is explicitly granted in another provision of the CAA, 42 U.S.C. § 7413(c)(1), which provides "a fine . . . or imprisonment for not to exceed 5 years, or both" for "[a]ny person who knowingly violates . . . any requirement or prohibition of . . . title VI (relating to stratospheric ozone control), including a requirement of any rule . . . promulgated or approved under such sections or titles, . . ." Therefore, a violation of § 82.4 is a violation of a "law" within the meaning of § 545, and we affirm Alghazouli's convictions on Counts 1, 2, 6, and 8.

## B.    Jury Instruction

Alghazouli contends the jury instructions for Count 8 were fatally flawed. Count 8 charged Alghazouli with conspiring to violate two money laundering statutes, 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1957(a), in violation of 18 U.S.C. § 1956(h). Alghazouli argues that the jury instructions for Count 8 did not sufficiently inform the jury about the nature of the offenses proscribed in these underlying money laundering statutes. The government contends that Alghazouli was not entitled to an instruction describing the elements of the underlying money laundering offenses prohibited in §§ 1956(a)(1)(A)(i) and 1957(a). In the alternative, the government contends that the elements of the underlying offenses were sufficiently described in the special verdict form read to, and provided to, the jury.

Because Alghazouli did not object to the jury instructions for Count 8, we review them for plain error. *United States v. Marsh*, 894 F.2d 1035, 1039 (9th Cir. 1989), *cert. denied*, 493 U.S. 103 (1990). He must show (1) that there was error, (2) that the error was plain, and (3) that the error affected his substantial rights. *Ching Tang Lo*, 447 F.3d at 1228. Even if he makes all three of these showings, we should exercise our discretion to reverse his conviction "only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

We conclude that the district court erred by not providing in the jury instructions the elements of the two money laundering offenses that were the objects of the conspiracy with which Alghazouli was charged in Count 8. However, we conclude that this was not "plain error." The error was not plain in the sense of obvious. Further, because the elements of the money laundering offenses were included in the jury verdict form, the error did not adversely affect Alghazouli's substantial rights. We therefore affirm Alghazouli's conviction on Count 8.

### 1.   Error

Count 8 charged Alghazouli with conspiracy under 18 U.S.C. § 1956(h). That section provides that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." Count 8 charged that the objects of the conspiracy were the two money laundering offenses set forth in §§ 1956(a)(1)(A)(ii) and 1957(a).

[10] It is well-established that a trial court errs if it fails to instruct the jury on an element of a charged offense. *See, e.g.*, *United States v. Gaudin*, 515 U.S. 506, 509-11 (1995). It is also well-established that a trial court errs in a conspiracy case if it fails to instruct the jury on an element of the crime that

is the object of the conspiracy. That is, if a jury is asked to determine whether a defendant conspired to commit an offense, the jury needs to know the elements of that offense. *See, e.g.*, *Ingram v. United States*, 360 U.S. 672, 678 (1959); *Ching Tang Lo*, 447 F.3d at 1231-32; *Evanchyk v. Stewart*, 340 F.3d 933, 941-42 (9th Cir. 2003); *United States v. Kim*, 65 F.3d 123, 126 (9th Cir. 1995); *see also United States v. Lake*, 472 F.3d 1247, 1263 (10th Cir. 2007); *United States v. Smithers*, 27 F.3d 142, 146-47 (5th Cir. 1994); *United States v. Winfield*, 997 F.2d 1076, 1081 (4th Cir. 1993); *United States v. Vaglica*, 720 F.2d 388, 391 (5th Cir. 1983). We note that, although the model jury instructions in the Ninth Circuit do not address the point, the model instructions of several of our sister circuits do. *See* Pattern Crim. Jury Instr. 6th Cir. 3.01A (2005) ("If the object offense is not charged and defined elsewhere in the instructions, it must be defined at some point in the conspiracy instructions."); Pattern Crim. Jury. Instr. 5th Cir. 2.20 (2001) (similar); Modern Federal Jury Instructions-Criminal § 70.5 (similar, for the Eleventh Circuit).

**[11]** In this case, the jury instructions for Count 8 informed the jury of the elements of a conspiracy under 18 U.S.C. § 1956(h). But the instructions omitted any description of the two underlying money laundering crimes that were charged as the objects of the conspiracy. Further, the instructions omitted a description of the nature of the underlying crime from which the laundered money was derived, even though convictions under §§ 1956(a)(1)(A)(i) and 1957(a) require that a defendant know that the money used in a money laundering conspiracy derived from an illegal activity. We therefore hold that it was error for the trial court not to instruct the jury as to the elements of these underlying crimes.

2.   Plain Error

**[12]** Where jury instructions fail to describe an element of the offense — here, the elements of the offense underlying the

conspiracy — the error is plain. *See, e.g.*, *United States v. Fuchs*, 218 F.3d 957, 962 (9th Cir. 2000). The facts of the case before us, however, are somewhat different. The district court did not read to the jury, as part of the formal jury instructions for Count 8, any description of the money laundering offenses charged under §§ 1956(a)(1)(A)(i) and 1957(a). But, as described in the next subsection, the court did read and provide to the jury a special verdict form for Count 8, which contained the substance of those two provisions.

**[13]** As we have stated in a somewhat different context, "Verdict forms are, in essence, instructions to the jury." *United States v. Reed*, 147 F.3d 1178, 1180 (9th Cir. 1998). In the circumstances of the case before us, where the substance of the two money laundering offenses was contained in the special verdict form that was read and provided to the jury, we are unwilling to conclude that the district court committed plain error in omitting this information from the formal jury instructions. While it was error to include the information in the special verdict form rather than the formal jury instructions, it was not plain error.

Because in this case the question of whether the error was "plain" overlaps to some degree with the substantial rights question, we proceed to the third stage of the plain error inquiry.

### 3.  Affecting Substantial Rights

"In the context of plain error review, for an error to affect substantial rights, 'in most cases it means that the error must have been prejudicial.' " *United States v. Perez*, 116 F.3d 840, 847 (9th Cir. 1997) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). The prejudice requirement applies in review for nonstructural error. *United States v. Dominguez Benitez*, 542 U.S. 74, 81-82 (2004). To show prejudice, an appellant must show " 'a reasonable probability that, but for [the error claimed], the result of the proceeding would have been differ-

ent.' " *Id.* at 82 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

When determining prejudice, we do not examine jury instructions in isolation. In some circumstances special verdict forms can cure problems created by defective instructions. *See Reed*, 147 F.3d at 1180 ("[T]he propriety of using a special verdict should be determined according to 'the particular circumstances of [each] case.' ") (quoting *United States v. O'Looney*, 544 F.2d 385, 392 (9th Cir. 1976)); *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1418 (9th Cir. 1986) (jury instructions, when combined with the special verdict form, adequately set forth the relevant elements of a negligence charge).

Count 8 charged a conspiracy to engage in money laundering in violation of two substantive provisions, §§ 1956(a)(1)(A)(i) and 1957(a). Section 1956(a)(1)(A)(i) provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity — with the intent to promote the carrying on of specified unlawful activity . . . , shall be sentenced to [a fine or imprisonment].

The corresponding language of the special verdict form, which was read to the jury at the end of the jury instructions and was sent into the jury room afterwards, was as follows:

> [D]o you find beyond a reasonable doubt that the object of the conspiracy was to, one, promote the carrying on of the unlawful activity, the sale of merchandise imported contrary to law, knowing the property involved in the financial transactions repre-

sented the proceeds of some form of unlawful activity?

Section 1957(a) provides:

> Whoever, in any of the circumstances set forth in subsection (d),[4] knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished [as provided, *infra*].

The corresponding language of the special verdict form was as follows:

> [Do you find beyond a reasonable doubt that the object of the conspiracy was to,] two, knowingly engage in monetary transactions in criminally-derived property of a value greater than $10,000 and is derived from the unlawful sale of merchandise imported contrary to law?

In determining whether the special verdict form adequately informed the jury of the elements of the two underlying money laundering offenses, we must perform a two-part analysis. This two-part analysis is necessitated by the fact that the conspiracy statute depends on the money laundering crimes that are the object of the conspiracy. The money laundering statutes, in turn, depend on the crime from which the laundered money was derived.

First, we must perform the analysis required in any conspiracy case. That is, we must decide whether the special verdict forms adequately described the elements of the offenses that

---

[4]Section 1957(d) provides that the offense must take place in a geographical location subject to the jurisdiction of the United States. This element of § 1957(a) was not in dispute in this case.

were the object of the conspiracy, to the degree that those elements are set forth in the text of the statute whose violation is charged as the object of the conspiracy. In this case, those statutes were §§ 1956(a)(1)(A)(i) and 1957(a). As is apparent from a comparison of the language of these statutes and the language of the special verdict form, the elements set forth in the texts of §§ 1956(a)(1)(A)(i) and 1957(a) were sufficiently described in the special verdict forms.

Second, we must decide whether the special verdict forms adequately described the nature of the underlying crime from which the laundered money was derived, and whether the forms adequately specified the mens rea of the defendant with respect to that underlying crime. Both of the money laundering offenses that were charged as the object of the conspiracy require that the money be derived from illegal sources. Section 1956(a)(1)(A)(i) specifies that the money be "proceeds of unlawful activity"; § 1957(a) specifies that the money be "criminally derived property" and the product of "unlawful activity." Both sections also require that the defendant have some knowledge of the illegality of the activity. Section 1956(a)(1)(A)(i) requires that the defendant be "knowing"; § 1957(a) requires that defendant act "knowingly."

It is obvious that a jury must be informed, in some manner, of the criterion or criteria for determining the illegality of the conduct from which the money is derived. If the jury is not so informed, there is a danger that the jury might be persuaded to convict even though the "laundered" money was, in fact, derived from legal activity. Yet it is equally obvious that a full explanation of every element of the underlying crime that produced the money will not always be necessary. For example, in *United States v. Golb*, 69 F.3d 1417 (9th Cir. 1995), we held in a money laundering case that the jury did not need to be given an instruction on every element of the underlying crime from which the money was derived. We wrote, "The jury was instructed 'as a matter of law that the manufacture, importation, and distribution of controlled sub-

stances is a specified unlawful activity,' and that the government had to prove that at least some of the funds involved represented the proceeds of the 'manufacture, importation and distribution of controlled substances.' . . . [T]he jury did not need to be further instructed." *Id.* at 1429.

**[14]** In this case, it is clear that the jury was adequately informed, both of the illegality of the underlying conduct and of the requirement that Alghazouli knew of its illegality. There was no instruction directed to Count 8 comparable to the instruction in *Golb.* But such an instruction was not necessary, for the underlying crime from which the money was derived was a violation of 18 U.S.C. § 545. Violating § 545 was directly charged in Counts 1, 2, and 6. The jury was properly instructed on those counts, and it found Alghazouli guilty. Thus, when the jury found Alghazouli guilty of conspiracy to engage in money laundering, it was well aware of the nature of the illegal activity from which the money was derived, because it already had convicted Alghazouli for that activity. Further, given the mens rea requirement for a conviction under § 545, the jury concluded, when it convicted Alghazouli on Counts 1, 2, and 6, that he knew that the money was derived from illegal activity (indeed, *his own* illegal activity), thus satisfying the mens rea requirements of §§ 1956(a)(1)(A)(i) and 1957(a).

### C.   "Knowingly" under 42 U.S.C. § 7413(c)(1)

**[15]** Alghazouli was convicted on Count 15 under 42 U.S.C. § 7413(c)(1) for violating 40 C.F.R. § 82.154(m). As we noted, *supra*, the Clean Air Act specifies in § 7413(c)(1) that "[a]ny person who knowingly violates . . . any requirement or prohibition of . . . subchapter VI of this chapter (relating to stratospheric ozone control)" is guilty of a crime. Section 82.154(m) is a regulation relating to stratospheric ozone control within the meaning of § 7413(c)(1). Subject to exceptions not relevant here, it provides that "[n]o person may sell or distribute, or offer for sale or distribution, any sub-

stance that consists in whole or in part of a class I or class II substance for use as a refrigerant to any person." Alghazouli was charged with violating this regulation by selling a class I substance to an uncertified individual for use in a motor vehicle. The district court instructed the jury as follows: "To establish a knowing violation of a requirement of the stratospheric ozone regulations, the government need only prove that the defendant had knowledge of the facts that constitute the offense; not that the defendant knew his acts were unlawful."

Alghazouli contends that he did not violate § 7413(c)(1) because he did not know that his conduct was illegal under § 82.154(m). The government disagrees, contending that § 7413(c)(1) requires only that Alghazouli have known the facts that constitute the offense. For the reasons that follow, we conclude that the jury was properly instructed. We therefore affirm Alghazouli's conviction on Count 15.

**[16]** The Second, Fifth, and Sixth Circuits have held that § 7413(c)(1) requires only that the defendant have knowledge of the facts that constituted the offense. *See United States v. Ho*, 311 F.3d 589, 605-06 (5th Cir. 2002) ("knowingly" in § 7413(c)(1) "means knowledge of underlying facts, not law," particularly in the context of "hazardous substances"); *United States v. Weintraub*, 273 F.3d 139, 147 (2d Cir. 2001) (the phrase "knowingly violates" in § 7413(c)(1) "requires knowledge of facts and attendant circumstances that comprise a violation of the statute, not specific knowledge that one's conduct is illegal"); *United States v. Buckley*, 934 F.2d 84, 88 (6th Cir. 1991) (the prohibition in the version of § 7413(c)(1) preceding the 1990 CAA Amendments "requires knowledge only of emissions themselves, not knowledge of the statute or of the hazards that emissions pose").

In *Weintraub*, 273 F.3d at 146-47, the Second Circuit relied on the Supreme Court's decision in *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558 (1971), in

which a public welfare statute provided criminal penalties for anyone shipping acids who " 'knowingly violates any . . . regulation' " governing such transportation. *See id.* at 559 (quoting 18 U.S.C. § 834(f)). The Court held that the statute did not require knowledge of the regulation. Rather, the Court held, the statute required only knowledge of the fact that the shipped substance was acid. *See id.* at 563 ("[W]e decline to attribute to Congress the inaccurate view that that Act requires proof of knowledge of the law, as well as the facts, and that it intended to endorse that interpretation by retaining the word 'knowingly.' "). The Court reached this conclusion in part because where "dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *Id.* at 565.

**[17]** We have not previously addressed the "knowingly" requirement in § 7413(a)(1), but we have interpreted an analogous provision in the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* ("CWA"). In *United States v. Weitzenhoff*, 35 F.3d 1275 (9th Cir. 1994) (as amended), we held that "knowingly" in 33 U.S.C. § 1319(c)(2) does not require that the defendants "knew that their acts violated the permit [at issue] or the CWA." *Id.* at 1286. Instead, the term "knowingly" requires only that the defendants knew the facts that constituted the violation. In so holding, we relied on the Court's decision in *International Minerals*, just as the Second Circuit did in *Weintraub*. We wrote that the CWA is a "public welfare statute[ ]," a category that, in general, does not require knowledge of the law for its violation. *Id.* at 1284; *see also, e.g.*, *United States v. Lynch*, 233 F.3d 1139, 1143 (9th Cir. 2000) (interpreting the phrase "knowingly violate" in the Archeological Resources Protection Act as not requiring knowledge of the law, but only "knowledge of the facts that make a trespass a felony").

Alghazouli contends that the Supreme Court's recent decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696

(2005), undermines the decisions of the three circuits that have held that the "knowingly violates" language in § 7413(c)(1) requires only knowledge of the facts constituting the violation, as well as our analogous decision in *Weitzenhoff*. In *Arthur Andersen*, the Court interpreted a witness-tampering statute providing that "anyone who knowingly . . . corruptly persuades another person . . . with intent to . . . cause" that person to withhold or alter documents used in an "official proceeding" commits a crime. 18 U.S.C. § 1512(b)(2). The Court held that the phrase "knowingly . . . corruptly persuades" requires that the petitioner Arthur Andersen not only knew that it was persuading someone, but also that it was doing so "corruptly," with knowledge of the wrongfulness of its conduct. The Court wrote:

> [T]he natural meaning of these terms provides a clear answer. "[K]nowledge" and "knowingly" are normally associated with awareness, understanding, or consciousness. "Corrupt" and "corruptly" are normally associated with wrongful, immoral, depraved, or evil. Joining these meanings together here makes sense both linguistically and in the statutory scheme. Only persons conscious of wrongdoing can be said to "knowingly . . . corruptly persuad[e]."

*Arthur Andersen*, 544 U.S. at 705 (citations omitted; first alteration added).

For three reasons, we do not agree that *Arthur Andersen* undermines our sister circuits' decisions interpreting § 7413(c)(1) or our decision in *Weitzenhoff* interpreting the CWA. First, as the Court emphasized in *Arthur Andersen*, the phrase "knowingly . . . corruptly persuades" indicates that Congress intended to punish criminally only a person who knows that he or she is acting corruptly. By contrast, the phrase "knowingly violates" does not necessarily indicate anything more than that the defendant must know what he or she is doing. The phrase does not necessarily indicate that the

defendant also must know that what he or she is doing is illegal.

Second, unlike the statute at issue in *Arthur Andersen*, the CAA is a public welfare statute dealing with harmful substances. As discussed above, the Court in *International Minerals* sustained a conviction for shipping a harmful substance in violation of a public welfare statute. By contrast, the Court in *Arthur Andersen* noted that the "act underlying the conviction — 'persua[sion]' — is by itself innocuous," making " 'restraint in assessing the reach of a federal criminal statute' " "particularly appropriate." 544 U.S. at 703 (citation omitted; bracket in original).

**[18]** Third, the legislative history supports a reading of § 7413(c)(1) that requires a defendant only to have knowledge of the facts. *Cf. Weitzenhoff*, 35 F.3d at 1283 ("turn[ing] . . . to the legislative history of the provision at issue to ascertain what Congress intended"); *United States v. Johal*, 428 F.3d 823, 826 (9th Cir. 2005) ("In determining what mental state is required to prove a violation of the statute, we look to its words and the intent of Congress."). The October 1990 Congressional Record contains a Conference Committee report read into the record by Senators Chafee and Baucus, stating:

> Indeed, the criminal provisions that are introduced in section 113(c) are largely modeled upon those contained in the CWA and [Resource Conservation Recovery Act], and we expect them to operate in the same fashion as those have operated. In particular, it is our intention that — with the exception only of the crimes of knowing and negligent endangerment — crimes under these new criminal provisions shall be crimes of general intent, rather than crimes of specific intent.

136 Cong. Rec. S16895-01 (daily ed. Oct. 27, 1990) (Chafee-Baucus statement of Senate Managers, S. 1630, Clean Air Act Amendments of 1990).

## D.   Sentencing

Finally, Alghazouli argues that the district court erred in sentencing by failing to apply properly the factors enumerated in 18 U.S.C. § 3553(a). We disagree. The district court's explanation of its sentence survives any standard of appellate review for reasonableness, and we therefore affirm Alghazouli's sentence.

**[19]** Alghazouli argues that the district court "incorrectly believed that if it determined that the advisory guideline range was reasonable, then that was the sentencing range that should govern." But the district court did not state that it was bound by the Guidelines. Instead, it discussed at length the factors enumerated in § 3553(a) and their application to Alghazouli's case. The court explained that "I look to the factors in section 3553(a) to determine a reasonable sentence in your case" and "I look at all these factors, . . . having benefit of hearing the evidence at trial with respect to . . . the circumstances of this offense." The court concluded, after a detailed account of its reasoning, that, "[h]aving considered all these factors, the court finds that the guideline range reflects a reasonable range for sentencing in your case." The court then chose, in its words, "the low end of the guideline range," sentencing Alghazouli to forty-one months in custody.

**[20]** Recent decisions support the conclusion that the court's sentencing decision was reasonable. *See Gall v. United States*, 128 S. Ct. 586, 591 (2007) ("[C]ourts of appeals must review all sentences — whether inside, just outside, or significantly outside the Guidelines range — under a deferential abuse-of-discretion standard."); *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007) ("[W]hen a judge decides simply to apply the Guidelines to a particular case, doing so will not necessarily require lengthy explanation."); *United States v. Mix*, 457 F.3d 906, 912 (9th Cir. 2006); *United States v. Menyweather*, 447 F.3d 625, 634-35 (9th Cir.

2006); *United States v. Knows His Gun*, 438 F.3d 913, 918 (9th Cir. 2006).

## Conclusion

We hold that the term "law" in 18 U.S.C. § 545 includes a "regulation" when, but only when, a statute (a "law") specifies that violation of the regulation is a crime. We therefore affirm Alghazouli's convictions on Counts 1, 2, and 6. We hold that the court erred in failing to instruct the jury on the elements of the underlying substantive money laundering offenses that were the object of the charged conspiracy, but that the error was not plain and that it did not affect Alghazouli's substantial rights. We therefore affirm Alghazouli's conviction on Count 8. We hold that the term "knowingly" in 42 U.S.C. § 7413(c) requires only that the defendant know the facts constituting the violation. We therefore affirm Alghazouli's conviction on Count 15. Finally, we hold that the district court properly applied the § 3553(a) sentencing factors. We therefore affirm Alghazouli's sentence.

**AFFIRMED.**